IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **CLAY WESTBROOK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action File No:** |
| V. ) | |
| ) | **JURY TRIAL DEMANDED** |
| **CUSHMAN & WAKEFIELD** ) | |
| **PLC,** ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiff Clay Westbrook ("Westbrook" or "Plaintiff") brings this action for relief and damages against Defendant Cushman & Wakefield PLC ("Cushman & Wakefield" or "Defendant") based on the following allegations and causes of action:

## NATURE OF THE ACTION

1. This action arises under The Americans with Disabilities Act of 1990 ("ADA") as amended, 42 U.S.C.A. § 12101, et. seq., to correct unlawful employment practices based on Plaintiff's disability and his opposition to discrimination based on his disability. Plaintiff alleges that after he disclosed to senior company officials that he has a real and perceived disability known as

1

Asperger's Syndrome, that Defendant engaged in various adverse actions based on his disability and subjected him to a hostile work environment. Plaintiff also brings a claim for retaliation under 42 U.S.C.A. § 12203(a) on the grounds that after he made internal complaints about the mistreatment in his workplace, he was subjected to repeated retaliatory acts that culminated in his termination. Plaintiff seeks economic compensatory damages including back pay, front pay, and lost benefits; non-economic compensatory damages; and punitive damages; as well as attorneys' fees and costs of litigation.

## THE PARTIES

2.      Plaintiff Westbrook is a citizen of the United States and a resident of the state of Georgia. During the time of the events alleged in this complaint, Westbrook was employed by Defendant as Director of Market Research at their Atlanta, GA office.

3.      Defendant Cushman & Wakefield is a major commercial real estate company headquartered in Chicago, IL, that employs over 45,000 people in 70 countries. Their Southeast regional office is located at 1180 Peachtree St. NE, Atlanta, GA 30309.

## SUBJECT MATTER JURISDICTION AND VENUE

4. Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

5. Venue is proper in this district and division under 28 U.S.C.A. § 1391 as Defendant conducts business in, and the alleged unlawful acts occurred in, this district and division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff Westbrook filed a charge of discrimination against Defendant Cushman & Wakefield with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2019- 07697, on August 21, 2019. A copy of this charge is attached as Exhibit A.

7. Plaintiff Westbrook subsequently received a Right to Sue letter from the EEOC on May 12, 2021. A copy of this charge is attached as Exhibit B.

8. Plaintiff timely files this action within 90 days of the issuance of a Right to Sue Letter.

9. All administrative remedies have been satisfied prior to the filing of this civil action.

## FACTUAL ALLEGATIONS

3

10. Plaintiff Westbrook, an honors graduate of the University of Georgia School of Law in 1993, has built an accomplished career in the highly complex sector of capital markets and commercial transactions. After fourteen years of practicing corporate law in Atlanta, Westbrook transitioned into business consulting. His portfolio of expertise included corporate finance strategy, business debt restructuring, and post-bankruptcy reorganization: extremely valuable tools as the economy recovered from its near collapse in late 2008 and entered a prolonged global recession. Westbrook is a published author, having written a book in 2016 about his experiences advising companies on survival in the aftermath of the 2008 financial crisis.

11. Westbrook thrived despite being on the autism spectrum: he has a specific condition called Asperger's Syndrome. ("Asperger's"). Asperger's at its core is a pervasive social disorder that affects how individuals engage their environment and interact with others. Its typical characteristics can include a lack of ease and a discomfort in some social and interactive work settings; an exaggerated focus on detail; a penchant for overly assertive mannerisms and behaviors that project intensity; extreme sensitivity to large crowds and to dramatic light or noise; and what can present as a nervous agitation or anxiety in pressured interactions or during conflict.

12. Asperger's has been universally recognized within the medical field as a developmental disability, and its visible manifestations cause individuals with the condition to be regarded as having a disability.

13. Asperger's happens to be a highly manageable disorder, and it is well documented that individuals with Asperger's can learn coping techniques to excel in high-pressure settings. *See, e.g.,* "What is High Functioning /Autism?" *Medical News Today*, February 24, 2021; "You Don't Look Autistic: The Reality of High-Performing Autism," *Washington Post*, March 3, 2020. Asperger's did not prevent Westbrook from achieving an estimable amount of prestige and success as a business consultant in the Atlanta area and nationally.

14. Westbrook's reputation in Atlanta business circles led to him obtaining a prime position at a major global commercial real estate company, Cushman & Wakefield, as the Director of Market Research in their Atlanta office. His hiring in May 2017 merited a press release from John O'Neill, the Managing Principal of the Cushman & Wakefield Atlanta office: "Clay is tremendously talented and will be a valuable asset…[h]is unique background with experience in the real estate, capital markets and legal sectors, as well as his expertise in economics, financial and forecasting modeling made him an ideal candidate for this position."

15. The market research division is a pivotal part of Cushman & Wakefield's operations, as the company depends on first-in-class analysis of commercial development trends in given markets. Westbrook's role was to coordinate all data analysis in the 20 county Atlanta region across the company's product lines; manage their proprietary databases; and direct the preparation of the quarterly market analysis, which is highly anticipated within the commercial real estate industry in the Southeast.

16. Cushman & Wakefield's directors of market research are typically influential in the formulation of business growth strategies in their region and play a prominent role in client development and marketing, including potential client "pitches" and briefings to economic stakeholders.

17. Westbrook's first year at Cushman & Wakefield was consistently successful. The company values internal productivity metrics, and Westbrook's research team expanded its content and delivery of analytics significantly under his leadership. Westbrook received praise from senior officials throughout the company for devising and instituting several initiatives to strengthen the design quality of research content and for developing a comprehensive internal library to collect and share data. Although John O'Neill, the Managing Principal in Atlanta, raised concerns about some aspects of the research team's performance during Westbrook's first six months, he made it a point to tell Westbrook in January 2018

that his concerns had been addressed and that Westbrook had "really turned things around."

18. In the late spring of 2018, Westbrook started experiencing an increased level of anxiety at work that he believed was exacerbated by sensitivities related to Asperger's. One trigger for Westbrook was the configuration of the research team's work area. Rather than provide individual office spaces, Cushman & Wakefield employed an open floor plan in which the team worked in one common area that is not separated by walls. The research work area also featured floor to ceiling windows that permitted bright sunshine to bathe the entire area. Persons with Asperger's can become discomfited by constant noise and chatter and by strong environmental factors like intense light.

19. Westbrook had never disclosed to the company or any employees that he has Asperger's.

20. In early June, Westbrook made the decision to report his condition to Lindsey McIntosh, the senior human resources representative for the Atlanta office, and John O'Neill, and to seek the specific accommodation of being assigned his own private, windowless office just off the research team's open space.

21. While McIntosh promptly granted the accommodation and allowed Westbrook to move into the office he requested, O'Neill's response was sharply

negative. On June 6, 2018, he admonished Westbrook for moving to a new office, telling Westbrook that the shared office space for the research team was a central part of O'Neill's vision for the Atlanta office, and that moving to a space across the hall would somehow feed a perception that Westbrook was distancing himself from his team. O'Neill openly ridiculed the company's "obligation" to accommodate a request that he made clear he thought was unjustified.

22.     During the same June 6 meeting, O'Neill also made the observation that in his view, Westbrook should have disclosed his Asperger's during the hiring process; O'Neill also questioned whether in light of the condition, Westbrook was suited to perform the leadership duties associated with the role. As an example, O'Neill implied that the condition might be related to what O'Neill characterized as Westbrook's tendency to "not engage or to be a presence around the office." O'Neill went further, at one point conveying his "strong opinion" that Westbrook's condition should be announced to his team so that his personality and actions would be "better understood." Westbrook took the observation as a veiled threat to further disclose or face disclosure.

23.     Westbrook was shaken by the encounter with O'Neill, and on June 11, 2018, initiated a formal complaint with the HR division that he had felt bullied and threatened by O'Neill. Westbrook also notified the company's Chicago-based Vice

President of Market Research for the East Region, Simone Schuppan, that he has Asperger's.

24. On or about June 29, 2018, Westbrook arrived at work and discovered that his office had been trashed and his desk and chair pushed into the research team work space area. Several weeks later, on July 13, while O'Neill professed to be disturbed by the incident, he suggested that Westbrook had made himself vulnerable to resentment and office bullying by engaging in behavior that was not understood by other personnel, such as moving to a new office. O'Neill once again pushed Westbrook to reveal his condition, and stated that as the principal manager for the office, he found it uncomfortable to be unable to explain to the research team why Westbrook was entitled to move into a private office.

25. Westbrook reported the July 13 conversation with O'Neill to McIntosh in HR, specifically telling her that he felt the revelation of his condition to O'Neill had damaged his standing at Cushman & Wakefield.

26. There is no evidence that the aforementioned complaints Westbrook lodged against O'Neill were ever seriously investigated by the HR department or that O'Neill was admonished for his actions.

27. In the wake of Westbrook's disclosure, as well as his complaints about O'Neill to HR, O'Neill initiated a series of escalating adverse actions against

Westbrook. O'Neill became openly brusque and dismissive of Westbrook during their interactions. In August 2018, O'Neill attended a monthly meeting of the research team, an unusual event for him, and openly chastised Westbrook's work in front of Westbrook's subordinates. During a late August meeting of senior leadership with the investor services division—a major Cushman & Wakefield event—O'Neill ignored his head of market research and declined to extend him an opportunity to present.

28. In early September, O'Neill informed Westbrook that going forward, he was no longer Westbrook's direct report and that Westbrook would be supervised by another member of the leadership team, Tyler Courtney. Within the Cushman & Wakefield office culture, research director is considered to be a senior management role that is one of a team of executive figures who directly engage and advise the managing principal. O'Neill's ending Westbrook's direct access to him was a de facto demotion.

29. In late September 2018, Westbrook sought out McIntosh in HR again to tell her that he felt O'Neill was punishing him for his earlier complaints and for his condition; McIntosh made it clear she had done all that she intended to do and considered the matter closed.

30. During the fall of 2018, Westbrook's fortunes at Cushman & Wakefield continued to deteriorate. His new "supervisor," Tyler Courtney, and O'Neill began directly engaging members of the research team who were under Westbrook's leadership, an event which eroded respect for Westbrook's leadership. During an internal planning event, responsibility for one of the major components of the research department's portfolio, economic forecasting, was reassigned to another division. Through the fall of 2018, Courtney, who was not immersed in the mechanics of the research department, started to constantly badger Westbrook and the research team for information and updates on the status of projects, to the point that various members of the team openly treated Courtney as their functional leader.

31. At some point in early November 2018, several employees reported through internal channels to the corporate headquarters that there was a perception in the Atlanta office that Westbrook was being treated abusively. Within weeks of this complaint, O'Neill reached out to Simone Schuppan to inform her of his intent to fire Westbrook on the purported grounds that he had become a distraction and that senior figures no longer wanted to work with him. Schuppan questioned the basis for the termination, informing O'Neill that under company protocols, a dismissal of a senior department head in an office could not be undertaken without

adequate performance or conduct related grounds. O'Neill was instructed to wait until Schuppan could conduct her own assessment of Westbrook's work.

32. On November 20, 2018, Westbrook was informed by Tyler Courtney that he was being placed on a performance improvement plan ("PIP"), a notice of poor performance that is a prelude to possible termination. Cushman & Wakefield did not follow its own internal policies of advance counseling and corrective measures prior to the entry of a PIP.

33. On December 12 and 13, 2018, Schuppan visited the Atlanta office and conducted her own review of the research team and Westbrook's work, meeting with other department heads who actively engaged the research staff. Schuppan informed O'Neill that based on the information she obtained, Westbrook was well regarded, and that the few identified issues were routine in nature and did not reflect on Westbrook's competence. Schuppan instructed O'Neill that based on the information available to her, she saw no valid basis for termination and viewed Westbrook's termination as potentially legally problematic for the company.

34. On December 17, 2018, Westbrook filed a formal written grievance with the HR department that he had been subjected by first O'Neill and then Courtney to continuing harassment, undermining of his performance, and abusive conduct since he disclosed his Asperger's condition.

35. On February 25, 2019, Westbrook was formally notified by Tyler Courtney and the director of operations that he was being terminated effective March 1, 2019. Westbrook was given no reason for his termination.

36. In the aftermath of Westbrook's termination, management in the Atlanta office actively damaged Westbrook's reputation by informing several of his former colleagues that the grounds for his termination could not be discussed. Westbrook learned from sources inside the company that the cryptic explanation and the suddenness of his departure generated speculation that Westbrook had engaged in some form of misconduct. Westbrook has continuously sought employment in the commercial transactions business in the Atlanta area since March 2019 and despite his credentials and experience, as of this filing, has yet to obtain an interview or advance to serious consideration for a new position.

37. Westbrook was subjected to a range of adverse actions at Cushman & Wakefield based on his disability and the perception by higher-level management at the Atlanta office that Asperger's is a substantially limiting impairment, and based on the fact that he engaged in protected activity by making internal complaints that he was subject to discrimination based on his disability.

38. Cushman & Wakefield has a recent history of discriminatory behavior against persons with a disability. The company's discriminatory conduct in

terminating an employee who needed leave for breast cancer treatments led to a $100,000 settlement with the EEOC and the entry of a consent decree in 2017. *See EEOC v. Cushman & Wakefield,* Civil Action No. 1:16-cv-02788-JKB. Defendant's discriminatory treatment of Westbrook based on his condition began just over a year after Cushman & Wakefield entered a judicial decree pledging to correct its illegal conduct.

## COUNT I
### (Disparate treatment in violation of the ADA)

39. Plaintiff Westbrook incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

40. Defendant Cushman & Wakefield is subject to the requirements of Title I of the ADA.

41. Westbrook is an individual with a permanent disability, Asperger's Syndrome, that impacts major life activities, including thinking and interacting with others, as defined by the ADA, 42 U.S.C.A. § 12102 (1)(A).

42. Cushman & Wakefield perceived Westbrook's disability, Asperger's Syndrome, as a substantially limiting impairment.

43. Cushman & Wakefield subjected Westbrook to adverse employment actions including disparate treatment and termination because of his disability.

44. As a result of Cushman & Wakefield's intentional discriminatory conduct, Westbrook has suffered monetary damages including but not limited to back pay and front pay, the loss of benefits, and non-economic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II
### (ADA hostile environment)

45. Plaintiff Westbrook incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

46. Westbrook is a person with an ADA-qualifying disability.

47. Westbrook experienced mistreatment during his employment at Cushman & Wakefield based on his disability, Asperger's Syndrome, that was severe or pervasive enough to alter the terms and conditions of his employment and create a disability-based, discriminatorily abusive working environment.

48. As a result of Cushman & Wakefield's intentional discriminatory conduct, Westbrook suffered non-economic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT III

### (Retaliatory mistreatment in violation of the ADA for opposing disability discrimination)

49. Plaintiff Westbrook incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

50. Westbrook engaged in protected activity in violation of 42 U.S.C.A. § 12203(a) by opposing conduct that he reasonably believed to be a violation of the ADA, by reporting to Cushman & Wakefield that a senior official in its Atlanta office subjected Westbrook to a disability-based hostile work environment.

51. After Westbrook engaged in opposition to conduct that he reasonably believed to be a violation of the ADA, Cushman & Wakefield retaliated against Westbrook in various ways, including but not limited to hostile and bullying behavior from a higher-level management figure, interference with and reduction of his job responsibilities, and unjustified negative performance evaluations.

52. Cushman & Wakefield's retaliatory actions individually and collectively well might have dissuaded a reasonable person from making a charge of discrimination.

53. As a result of Cushman & Wakefield's unlawful retaliatory conduct, Westbrook has suffered non-economic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT IV

### (Retaliatory termination in violation of the ADA for opposing disability discrimination)

54. Plaintiff Westbrook incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

55. Westbrook engaged in protected activity in violation of 42 U.S.C.A. § 12203(a) by opposing conduct that he reasonably believed to be a violation of the ADA, by reporting to Cushman & Wakefield that a senior official in its Atlanta office subjected Westbrook to a disability-based hostile work environment and further, that the same senior official retaliated against Westbrook for lodging an internal complaint that he, Westbrook, was subjected to an unjustified negative performance evaluation in retaliation for making complaints about discrimination.

56. After Westbrook engaged in opposition to conduct that he reasonably believed to be a violation of the ADA, Cushman & Wakefield retaliated against Westbrook by terminating his employment without a legitimate, non-discriminatory reason.

57. As a result of Cushman & Wakefield's intentional discriminatory conduct, Westbrook has suffered monetary damages including but not limited to back pay and front pay, the loss of benefits, and non-economic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT IV
## (**Punitive damages**)

58. Westbrook incorporates by reference all of the preceding paragraphs of this complaint as though set forth fully and separately herein.

59. Cushman & Wakefield has engaged in discriminatory practices, as set forth herein, with malice or with reckless indifference to the federally protected rights of Plaintiff Westbrook. Accordingly, Westbrook is entitled to recover punitive damages from Cushman & Wakefield pursuant to 42 U.S.C.A. § 1981a (b)(1).

## **PRAYER FOR RELIEF**

Wherefore, based on the above-stated claims, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits.

B. Compensatory damages to the extent allowed by law.

C. Punitive damages.

D. Attorneys' fees and costs of litigation.

E. Pre-judgment and post-judgment interest at the highest lawful rate.

F. Such other equitable and monetary relief as the Court deems just and proper.

Respectfully submitted, the 5th day of August 2021.

                                        **HKM Employment Attorneys LLP**
                                        *s/Artur Davis*
Artur Davis[1]
Jermaine "Jay" Walker
3355 Lenox Rd. NE
Suite 705
Atlanta GA 30326
adavis@hkm.com
404-220-9165
jwalker@hkm.com
404-301-4020

---

[1] Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action this same day. Davis is licensed in the state of Alabama and the District of Columbia.